**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROLINE MILLER, Individually and on behalf of all others similarly situated, | Civil Action No.: _____ |
| Plaintiff, | |
| vs. | |
| NATIONAL GENERAL INSURANCE COMPANY, NATIONAL GENERAL HOLDINGS CORPORATION and WELLS FARGO BANK, N.A., D/B/A WELLS FARGO DEALER SERVICES, | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Caroline Miller ("Plaintiff") files this Complaint, individually and on behalf of all others similarly situated (the proposed "Class"), against National General Holdings Corp., National General Insurance Company[1] and Wells Fargo Bank, N.A., doing business as Wells Fargo Dealer Services ("Wells Fargo") (collectively "Defendants"). The allegations herein are based upon personal knowledge as to matters concerning Plaintiff and her own acts, and upon information and belief as to all other matters. The allegations that are not based on Plaintiff's personal knowledge result from Plaintiff's counsel's investigation.

---

[1] As alleged in this Complaint, *see* ¶ 71 *infra*, Defendant National General Holdings Corp. is liable as the alter ego of National General Insurance Company. Collectively, this Complaint refers to Defendants National General Holdings Corp. and National General Insurance Company as "National General."

## INTRODUCTION

1.      Wells Fargo and its insurance underwriter National General conspired to steal hundreds of millions of dollars from unsuspecting automobile purchasers by imposing unwanted, unneeded and unlawful automobile insurance costs on them.

2.      For more than a decade, Wells Fargo, together with National General, engaged in a continuous scheme to cheat unsuspecting auto loan customers into paying for unnecessary, unwanted and unlawful lender-placed or "force-placed" automobile insurance policies, commonly referred to as collateral protection insurance ("CPI").  Defendants' scheme resulted in the forced payment of unnecessary auto insurance policies, the incurrence of substantial and unwarranted fees and charges, negative credit reporting and other delinquencies, and/or repossession of Class members' vehicles.

3.      Plaintiff brings this proposed class action on behalf of herself and all other persons who had an automobile loan originated by Defendant Wells Fargo Bank, N.A. through its division, Wells Fargo Dealer Services and, in connection therewith, were charged CPI, provided by National General on the secured personal property within the applicable statute of limitations (the proposed "Class Period").

4.      Lenders, like Wells Fargo, often require borrowers to purchase and agree to maintain insurance coverage on automobiles purchased as a condition to funding automobile loans. Plaintiff and class members were required to obtain and maintain such insurance as a condition of their automobile loan from Wells Fargo.

5.      If a borrower fails to maintain the required insurance on their automobiles while they still owe money to the lender, the lender, through pre-arranged agreements with third party insurers/service providers, like National General, can choose to replace the borrower's insurance

policy in the form of CPI.  Lenders charge the premium associated with the CPI to the borrower's account, tacking on additional fees to the borrower's monthly payment, often automatically.  Many states require that borrowers be informed of the fact that they will be force-placed prior to the lender purchasing such insurance for their vehicles.

6.      Defendants acted together to exploit Wells Fargo's ability to force-place auto insurance to enjoy additional, unjustified profits in the form of premiums, commissions, fees and other financial benefits at the expense of borrowers who were charged for the force-placed insurance but had not let their voluntary automobile insurance lapse and/or were not properly notified of the force-placed insurance as required under state law or the limited extent of its coverage.

7.      The hundreds of thousands of auto loan customers impacted by Defendants' scheme sustained financial damages beyond the cost of unlawful auto insurance.  The financial harm to customers include but is not limited to inflated premiums, delinquency charges, late fees, repossession costs, increased interest rates, overdraft fees, and damage to their credit reports.

8.      In July 2016, Wells Fargo retained a consultant to determine the scope of the fraud.  The results were staggering.  From 2012 through 2016:

- • More than 800,000 consumers were charged, and paid for, auto insurance they didn't need;

- • Some of those consumers are still paying;

- • The illegal scheme pushed 274,000 consumers into delinquency;

- • 25,000 consumers suffered the wrongful repossession of their vehicle, and the devastating costs and consequences of that;

- In many instances, consumers were never informed of the insurance before it was charged and deducted from their bank accounts;

- Wells Fargo received myriad complaints from consumers regarding the unneeded and unwanted insurance, but Wells Fargo continued harassing them for payment.

9.      Unlike auto insurance policies commonly taken out by vehicle owners, which not only cover the insured vehicle, but also liability for collisions with other vehicles, property loss, and bodily injury, CPI only covers the cost of damage to the insured vehicle. Ordinarily, if proof of auto insurance was not received by Wells Fargo's CPI provider, in this case National General, notices were required to be sent to borrowers, to prompt them to obtain the required coverage. However, neither Wells Fargo nor National General, which underwrote the CPI policies, checked their internal database to see if Wells Fargo's auto loan customers had insurance coverage or, if they did, they simply ignored what they learned. Instead, Defendants imposed redundant auto insurance coverage on the Wells Fargo auto loan customers and then, frequently and without any notice, automatically deducted the cost of the CPI insurance from the customers' bank accounts, along with the regularly scheduled principal and interest payment for the auto loan.

10.     Not only were the CPI policies unnecessary, they were more expensive than the coverage borrowers obtained on their own and carried significantly less coverage. Additionally, Wells Fargo received a kickback from National General in the form of shared commissions on each CPI policy, which provided the financial incentive to Defendants to unlawfully impose and/or maintain these unneeded and unwanted policies.

11.     Defendants' failure to properly disclose to their customers the unlawful CPI policies (and the truth regarding its policy coverage) and/or the resulting automatic deductions

4

from Wells Fargo's customers' bank accounts often put Class members in a financial tailspin. These unlawful deductions resulted in account delinquencies, overdrawn payment accounts, increased interest rates, late fees, repossessed vehicles, forced trade-ins, and damage to borrowers' credit.

12.     When borrowers, including Plaintiff, protested and informed Defendants that they did, in fact, maintain the required insurance and that the CPI was unnecessary, Defendants refused to remove the unlawful charges. Borrowers were forced to pay the charges in order to maintain their accounts in good standing, avoid further late and overdraft fees and interest charges, and avoid repossession of their vehicles.

13.     This is a proposed class action brought by Plaintiff on behalf of all persons who obtained an auto loan from Defendants and who were required to pay for a CPI policy. Plaintiff challenges, as further described herein, Defendants' practice of secretly imposing and/or wrongfully maintaining such CPI on their customers.

14.     Defendants formed an unlawful enterprise. When customers financed cars with Wells Fargo, the buyers' information was automatically sent by Wells Fargo to National General, which was supposed to check a database shared between Wells Fargo and National General, to see if the borrower had insurance coverage. If not, the insurer was required to send out notice to the borrower in order to prompt them to obtain the required coverage. Despite these procedures, Defendants developed a uniform practice of automatically obtaining unnecessary and unlawful CPI policies and deducted the cost of the CPI policies (policy premiums and interest) sometimes automatically from their borrower' bank account.  Defendants further failed to remove the unlawful policy when proof of the required coverage was provided.

15.     Defendants failed to properly disclose or provide any notice of the deductions for the CPI insurance policies or the extent of the CPI policy's coverage resulting in borrowers' missed payments, late fees, account overdraft fees, higher interest rates, repossessed vehicles, and damaged credit.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are at least one hundred members of the putative class and members of the putative class are citizens of states different from Defendants.  Plaintiff is a citizen of Wisconsin.  Defendants are citizens of various other states, but all Defendants are registered to conduct business in New York.

17.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962, and 1964.

18.     This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.

19.     This Court may exercise supplemental jurisdiction over the state law claims brought by Plaintiff and the putative class under 28 U.S.C. § 1367 because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

20.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) because Defendant National General's principal place of business is in this District, and all Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and, therefore, Defendants reside in this District for venue purposes.  Alternatively, venues lies within this judicial

district under 28 U.S.C. § 1391(b)(2) because the acts giving rise to the claims at issue in this lawsuit occurred, among other places, in this District.

## THE PARTIES

### PLAINTIFF CAROLINE MILLER

21.     Plaintiff Caroline Miller is an individual and resides at 3201 South 35th Street, Apartment 2, Milwaukee, Wisconsin 53215.  Plaintiff Miller financed a 2013 Volkswagen Routan through Wells Fargo.  Plaintiff Miller was a victim of Defendants' fraudulent conduct as alleged herein.  Despite having appropriate insurance of her own, Wells Fargo imposed forced CPI insurance on her, ratcheted up her monthly payment, charged her late fees, issued negative credit events to the credit bureaus, and repossessed her vehicle.

22.     On or about March 15, 2015, Plaintiff Miller financed the purchase of a 2013 Volkswagen Routan from Enterprise Car Sales in Milwaukee, Wisconsin.

23.     On her behalf, Enterprise Car Sales contacted several potential financing companies.

24.     Ultimately, Enterprise Car Sales secured financing for Plaintiff Miller through Wells Fargo Dealer Services.

25.     In accordance with Wells Fargo's loan requirements, Plaintiff Miller was required to have the vehicle covered by an approved motor vehicle insurance policy prior to leaving the dealership.

26.     While at the dealership, Plaintiff Miller contacted GEICO Insurance Company to insure the vehicle.

27.     Plaintiff Miller contracted with GEICO Insurance Company to provide insurance coverage for the vehicle and paid them $200 while on the telephone in order to open the policy.

7

28.     Plaintiff Miller was quoted a monthly price of approximately $84 to maintain her coverage through GEICO.

29.     On information and belief, the GEICO policy complied with all requirements of state law.

30.     On information and belief, the GEICO policy met all requirements Wells Fargo required of those financing vehicles with Wells Fargo loans.

31.     On information and belief, the GEICO policy met all requirements the dealership required of car buyers.

32.     Plaintiff Miller provided proof of insurance to the dealership.

33.     Plaintiff Miller was provided possession of the vehicle and left the lot.

34.     Wells Fargo quoted Plaintiff Miller a monthly cost of approximately $420 to finance the vehicle.

35.     Plaintiff Miller received billing in the amount of approximately $420 until approximately June of 2015.

36.     In or around June 2015, Plaintiff Miller's monthly payment amount inexplicably jumped to approximately $540, a $120 per month increase.

37.     Plaintiff Miller contacted Wells Fargo to inquire about this increased monthly cost and spoke to a Wells Fargo representative.

38.     The Wells Fargo representative informed her that the cost increase reflected the cost of motor vehicle insurance it required of her and had procured for her.

39.     Plaintiff Miller did not request that Wells Fargo purchase the additional insurance in addition to her GEICO coverage. Nor did Wells Fargo give her any notice that they were doing so.

40.    The Wells Fargo representative did not inform Plaintiff that she had the choice to have her GEICO policy remain in force rather than paying for Wells Fargo's force-placed insurance.

41.    The Wells Fargo representative gave Plaintiff Miller the impression that the coverage it purchased for her was "full coverage."

42.    Based on the discussion with the Wells Fargo representative, Plaintiff Miller believed that "full coverage" included liability, theft, collision, and bodily injury protections.

43.    Because Wells Fargo was forcing her to pay for its own insurance choice, and in light of her understanding that Wells Fargo's force-placed insurance was "full coverage," Plaintiff Miller canceled her GEICO insurance policy in or around June of 2015.

44.    Plaintiff Miller paid the $120 increase to Wells Fargo in addition to paying for her GEICO policy from the time Wells Fargo initiated the CPI until Plaintiff Miller canceled her GEICO Policy, which was at least one billing cycle.

45.    After cancelling her GEICO policy, Wells Fargo's forced insurance still required her to pay approximately $36 more for her loan each month than Plaintiff would have paid for her GEICO policy, but for significantly less coverage that Plaintiff believed was equivalent to her GEICO coverage.

46.    On information and belief, Defendants received kickbacks from each other in the form of shared commissions on the CPI policy issued on Ms. Miller's behalf for the time that Defendants unlawfully maintained the CPI policy

47.    The increased cost of her loan following Wells Fargo's forced insurance caused Plaintiff Miller to fall into arrears on her auto payments.

48.    On or about July 2016, approximately one year after Wells Fargo forced her to pay for its forced insurance, the bank repossessed Plaintiff Miller's vehicle.

49.    Plaintiff Miller was informed that her vehicle had been taken to Chicago, Illinois to be sold at auction.

50.    In order to stop this auction, Plaintiff Miller was required to pay back the arrears on the loan, the shipping costs to Chicago, as well as vehicle storage costs. This payment was approximately $2,200.

51.    In order to secure this amount, Plaintiff Miller was forced to use money reserved for her apartment's rent, her small fixed income, and also to borrow $600.00 from her parents.

52.    On information and belief, the Wells Fargo representative told Plaintiff Miller that even if she paid these fees, Plaintiff Miller would be required to pay additional shipping fees to bring the vehicle back to Milwaukee.

53.    In order to avoid further shipping costs, Plaintiff Miller, at her own expense, travelled from Milwaukee, Wisconsin to Chicago, Illinois to take possession of the vehicle.

54.    Upon arrival, she was notified by an attendant at the storage yard that an additional $100 fee was required to retrieve the vehicle. Plaintiff Miller paid this charge in order to retrieve her vehicle.

55.    Throughout the time period her vehicle was repossessed, Plaintiff Miller was paying for Wells Fargo's force-placed insurance on her vehicle.

56.    Plaintiff Miller's credit report reflects the fact that her vehicle was repossessed.

57.    After noticing the report on her credit, Plaintiff Miller contacted Wells Fargo to dispute the notice on her credit report as she believed it should be removed from her credit report since she had paid the arrears on her loan as well as the repossession costs.

58.    Had Wells Fargo not unilaterally raised Plaintiff Miller's loan rate to account for its force-placed insurance, she would have not have gone into arrears on her loan.

59.    A Wells Fargo representative instructed Plaintiff Miller to contact Volkswagen in order to deal with this black mark on her credit report.

60.    Plaintiff Miller contacted Volkswagen and was informed by a Volkswagen representative that there was nothing Volkswagen could do regarding removal of the negative credit information.

61.    In July 2017, Plaintiff Miller's vehicle was stolen by an unknown party or parties.

62.    Plaintiff Miller who was under the impression that she had "full coverage" made a claim against her force-placed insurance and was told theft was not covered under the policy. Plaintiff was further informed that the policy Wells Fargo and purchased only covered damages for collision.

63.    Plaintiff Miller's vehicle was located shortly thereafter by Police, with minor damage.

64.    In approximately August of 2017, Plaintiff Miller's auto loan payment was reduced back to $420 per month.

65.    On or about the same time, Plaintiff Miller received mailed notice that Wells Fargo was discontinuing the insurance option they had forced upon her.

66.    Shortly thereafter but before Plaintiff Miller could obtain new independent insurance, Wells Fargo again initiated a CPI policy on Plaintiff Miller with National General at a monthly rate of $19.

67.    Upon information and belief, the benefits under Ms. Miller's new CPI policy are identical to the benefits provided by the earlier CPI policy, which Defendants initiated at an approximate monthly rate of $120.

68.    Wells Fargo's and National General's actions have caused Plaintiff Miller damages and other significant difficulties.

69.    Plaintiff Miller, at her own expense, has been forced to engage a company to attempt to have the repossession removed from her credit report so that she can purchase the home.

**DEFENDANTS**

70.    National General Holdings Corporation is an insurance company, headquartered at 59 Maiden Lane, 38th Floor, New York, New York 10038.  National General was formerly known as the GMAC Insurance Group.

71.    National General Insurance Company, a Missouri corporation with its principle place of business in North Carolina, is a subsidiary of National General Holdings Corporation.  On information and belief, there exists, and at all times herein mentioned there existed, a unity of interest and ownership between defendants National General Holdings Corporation and National General Insurance Company such that any individuality and separateness between these defendants have ceased, and Defendant National General Holdings Corporation is liable as the alter ego of Defendant National General Insurance Company.  On information and belief, National General Insurance Company nominally underwrote collateral protection insurance policies for Wells Fargo auto loan borrowers, and nominally underwrote the collateral protection insurance policies for Plaintiff and other class members.  National General Insurance Company, however, is merely the alter ego of and a simple instrumentality or adjunct to National General Holdings Corporation.  National General Holdings Corporation exercises complete domination over

12

National General Insurance Company's business, including the underwriting of collateral protection insurance. National General Holdings Corporation's investor presentations, including its First Quarter 2017 Investor Presentation, hold itself out as the provider of collateral protection insurance, as well as the provider of collateral protection insurance for Wells Fargo. National General Holdings Corporation shares a website with National General Insurance Company, and holds itself to the public as offering auto insurance. National General Holdings Corporation used its domination over National General Insurance Company to defraud Plaintiff and other class members through the underwriting of unneeded, unwanted, and unlawful collateral protection insurance policies. Observing the two entities as separate for the purposes of this lawsuit would sanction a fraud and promote injustice.

72.    Wells Fargo Bank, N.A., doing business as Wells Fargo Dealer Services, specializes in home and auto loans for consumers. It lists its principal place of business as South Dakota.

73.    Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

## FACTUAL ALLEGATIONS

74.    Defendants charged more than 800,000 auto loan borrowers for CPI auto insurance that they did not need or want, which Defendants failed to properly disclose. As a result, borrowers were unlawfully charged inflated CPI policy premiums and interest, late fees, and, in some cases,

had their vehicles repossessed. Because of Defendants' unlawful acts, borrowers saw their bank accounts overdrawn, with unlawful fees assessed, and their credit scores damaged.

75.    Borrowers financed their vehicles through Wells Fargo. Wells Fargo provided the borrower's information to National General who was to then verify if the borrower had insurance coverage on the vehicle.

76.    If the borrower failed to provide proof of insurance, Defendants were required to send the borrower a request that he or she provide proof of insurance. However, Defendants engaged in a practice of secretly and automatically imposing these CPI policies on borrowers who, in many instances, already had auto insurance that carried more coverage than the CPI policies imposed by Defendants at a much lower cost. Thus, borrowers were paying premiums and interest on more expensive and lower value CPI policies they did not need or request.

77.    Collateral protection insurance, also known as force-placed insurance, serves as protection to lenders for collateral backing loans to borrowers.

78.    Defendants failed to properly disclose both the CPI policies and their resulting charges to borrowers.

79.    Because the CPI insurance charges were not properly disclosed and unknown to borrowers, they often resulted in delinquencies in those cases where the borrower had insufficient funds to cover the cost of the CPI policy. In turn, Wells Fargo assessed late fees to borrowers' bank accounts and charges for insufficient funds. These actions by Defendants resulted in damage to borrowers' credit reports as Defendants reported these delinquencies to credit reporting agencies.

80.    The CPI insurance policies coupled with Wells Fargo's internal rules about the order in which payments are applied to a customer's account further exacerbated the problem.

When Wells Fargo received a payment on an auto loan account, they applied it in the following order: interest on the auto loan, interest on the CPI insurance, principal on the auto loan, and then premium on the CPI policy.

81.    This order of payments resulted in both an increased amount of overall interest paid by borrowers and frequently overdrawn bank accounts and auto loan delinquencies.

82.    The extra, unexpected, and undisclosed additional expense pushed approximately 274,000 auto loan customers into delinquency resulting in almost 25,000 wrongly repossessed vehicles.

83.    Not only were the CPI insurance policies unnecessary, they were more expensive than the auto insurance policies customers had already obtained on their own and carried significantly less coverage.

84.    Unbeknownst to borrowers, Wells Fargo obtained the policies through National General, who received a commission on the policies "sold" to borrowers, and Wells Fargo even shared in the commissions with National General, further boosting their profits.

85.    Wells Fargo understands that pitfalls of lender-placed auto insurance, representing on its webpage[2]:

Here's why it's best to avoid lender-placed insurance:

- **Cost.** The premiums for lender-placed insurance are usually more expensive.

- **Coverage.** You usually get less coverage than if you purchased a policy on your own.

---

[2] https://www.wellsfargo.com/mortgage/manage-account/insurance/lender-placed-insurance/.  (last visited August 23, 2017) Defendants' webpage is referring to forced mortgage insurance, which is much more common, but fundamentally the same as forced auto insurance.

86.    On Wells Fargo's Frequently Asked Questions webpage, Wells Fargo also represents the following on its website[3]:

> Will Wells Fargo purchase lender-placed insurance without my knowledge?
>
> No.  If we find a problem with your insurance, we'll send you letters explaining what you need to do.  If we still don't receive acceptable proof of insurance, we'll let you know we're getting a lender-placed policy for you.

87.    As the New York Times first revealed, Wells Fargo and National General joined forces to defraud, at a minimum, hundreds of thousands of Wells Fargo's own customers by purchasing lender-placed auto insurance that was unneeded, unwanted, and often unknown by the consumer.

88.    Upon securing auto financing from Wells Fargo, customers' borrowing information was then routed to National General, which advertises itself as providing customers' with "the policy that works best for you" and "designed to give you the best possible auto insurance coverage—affordably—from your first car to your 21st."[4] National also represents to the public: "We're here when you need us. Count on it."

89.    However, as a result of the illicit scheme with Wells Fargo, National General was also there when automobile purchasers did NOT need them.

90.    Wells Fargo's own commissioned report reveals that Wells Fargo and National

---

[3]  https://www.wellsfargo.com/mortgage/manage-account/insurance/lender-placed-insurance/faqs/.    (last visited August 23, 2017).

[4] http://www.nationalgeneral.com/auto-insurance/. (last visited August 23, 2017).

General imposed unwanted and unneeded insurance on more than 800,000 purchasers.

91.     Rather than truthfully and carefully verifying whether borrowers already had sufficient insurance on the financed automobile, thus obviating the need for CPI, Defendants didn't do so.

92.     As such, hundreds of thousands of consumers were charged for CPI that they didn't need.

93.     As Wells Fargo itself admits, the cost of the CPI it procured through National General may be "considerably more expensive" than what the consumer could purchase on her own and may even be less comprehensive.

94.     Wells Fargo has specifically admitted that victims of the fraud include customers who unnecessarily paid the CPI, customers who received no notice whatsoever of the CPI, and customers whose autos were repossessed because of the additional costs of the CPI.  As for the latter, Wells Fargo admitted that the "premiums may have contributed to a default that led to their vehicle's repossession."

95.     On its website discussing how payments are applied to a consumer's auto loan, Wells Fargo outlines how the structure of such payments increased the overall interest consumers paid on their loans.  The order of payments was: interest, CPI, and only then would payments be applied to principal.  This payment structure increased the interest Wells Fargo extracted because it reduced the number of dollars that went to reducing the outstanding principal on the loan.

96.     The ramifications of the payment structure had even more damaging implications for customers.  By ordering the payments in that way, Wells Fargo maximized the likelihood of the consumer defaulting on the principal, thus generating unlawful repossessions and other negative consequences.

17

97.     And, according to Wells Fargo's own internal report, it was aggressive in repossessions, with some customers actually enduring multiple repossessions.

98.     Not only did Wells Fargo benefit from the CPI in the ways described above, but they also shared in National General's commissions for the improper insurance until approximately 2013.  It is unknown, at this time, whether Wells Fargo actually received some type of consideration from National General after this timeframe.

99.     Defendants actively concealed the program of imposing unnecessary insurance charges, often masked through consumers not noticing the embedded forced insurance charges automatically swept through their checking account through electronic payments made through the Automated Clearing House ("ACH") Network.

100.     Plaintiff was not apprised of the salient facts underlying her claims and did not, and could not, have ascertained those facts.

101.     The damages suffered by consumers were myriad and wide-reaching, including *inter alia*:

(a) unnecessary insurance premium charges;

(b) excessive insurance premium charges;

(b) improper interest charges caused by the forced insurance charges and payment structure employed by Wells Fargo;

(c) improper late fees and reinstatement fees;

(d) charges for insufficient funds based on the elevated payments because of the improper forced insurance;

(e) forced delinquencies;

(f) damage to consumers' credit reports based on negative credit events;

(g) improper repossessions and the crippling consequences thereof.

102.    After it found out the New York Times was going to release the facts underlying its latest scandal, Wells Fargo stated: "We take full responsibility for our failure to appropriately manage the [auto insurance] program and are extremely sorry for any harm this caused our customers, who expect and deserve better from us."

## TOLLING OF THE STATUTES OF LIMITATION

103.    Plaintiff could not have discovered, through the exercise of reasonable diligence, Wells Fargo's ongoing fraud, omissions, and misrepresentations through the exercise of reasonable diligence.

104.    Among other things, neither Plaintiff nor the other class members knew or could have known that Wells Fargo had assessed unlawful and excessive premiums and fees against their accounts as well as inadequate insurance coverage forced upon them.  The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges and fees assessed against Plaintiff's and class members' accounts as well as the true extent of the coverage forced upon them because of Defendants' concealment.

105.    Throughout the time period relevant to this action, Wells Fargo concealed from and failed to inform Plaintiff and the other class members vital information about their accounts and coverage forced upon them.  Defendants knowingly, affirmatively, and actively concealed the true nature of the assessed auto insurance premiums against their accounts as well as the true nature and extent of the coverage forced upon them.

106.    Despite their knowledge of the unlawful fees and premiums assessed against Plaintiff and the other class members' accounts and the true extent of the coverage forced upon them, Defendants kept Plaintiff and the other class members ignorant of vital information essential

to the pursuit of their claims.  Plaintiff and the other class members relied and were reasonable in

relying upon Defendants' affirmative and active concealment.  As a result, neither Plaintiff nor the

other class members could have discovered Wells Fargo's fraud.

107.    Defendants were under a continuous duty to disclose to Plaintiff and the other class

members the true nature of the fees assessed against their accounts and the true extent of the

coverage forced upon them, but chose to knowingly conceal the information from its customers.

108.    Thus, the running of all applicable statutes of limitation have been suspended with

respect to any claims that Plaintiff and the other class members have sustained as a result of

Defendants' wrongful conduct, by virtue of the discovery rule, the doctrine of fraudulent

concealment, and estoppel.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the

Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

Specifically, Plaintiff seeks to represent the following class:

> All residents of the United States who obtained an auto loan through
> Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer Services, or its
> subsidiaries or divisions, who were assessed charges for CPI auto
> insurance.  (the proposed "National Class").

> Additionally, or in the alternative, Plaintiff seeks to represent the following state-
> wide Sub-Class:

> All residents of the State of Wisconsin who obtained an auto loan
> through Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer Services,
> or its subsidiaries or divisions, who were assessed charges for CPI
> auto insurance. (the proposed "Wisconsin sub-class") (collectively
> the "Class").

110.    Excluded from the Class are Defendants and any of their members, affiliates,

parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers

and their immediate family members; and Court staff assigned to this case.  Plaintiff reserves the right to modify or amend these class definitions, as appropriate, during the course of this litigation.

111.   Plaintiff reserves the right to establish sub-classes as appropriate.

112.   This action may be brought and maintained pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and satisfies all predicate requirements

113.   *Numerosity: Federal Rule of Civil Procedure 23(a)(1).*  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believes that there are hundreds of thousands of Class members, the precise number of Class members is unknown to Plaintiff, but will be determined through discovery.  Class members' names and addresses are ascertainable and identifiable through information on available loan documents and Defendants' records, and Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

114.   *Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).*  This action involves several critical common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

a.     Whether Defendants concealed or failed to properly disclose CPI insurance to Plaintiff and Class members;

b.     Whether Defendants concealed or failed to properly disclose the true extent of the coverage forced upon Plaintiff and Class members;

c.     Whether Defendants overcharged Plaintiff and Class members for the cost of CPI;

d.      Whether Defendants' practice of charging CPI auto insurance premiums to borrowers is unlawful;

e.      Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of the various state consumer protection laws alleged herein;

f.      Whether Defendants engaged in false, misleading, or deceptive acts or practices in the conduct of any trade or commerce in violation of the various state consumer protection laws alleged herein;

g.      Whether Defendants made representations or statements of fact which were untrue, deceptive or misleading in violation of the various state consumer protection laws alleged herein;

h.      Whether Defendants were members of, or participants in the conspiracy alleged herein;

i.      Whether Defendants omitted material facts in documents provided to Plaintiff and the other Class members;

j.      Whether Defendants engaged in a pattern or practice of racketeering;

k.      Whether Plaintiff and the other Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

l.      the amount and nature of relief to be awarded to Plaintiff and the other Class members.

115.    *Typicality: Federal Rule of Civil Procedure 23(a)(3).*  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members all secured auto-

loans through Wells Fargo, were assessed charges for CPI auto insurance.  Furthermore, the factual bases of Defendants' conduct are common to all class members and represents a common thread of deliberate and fraudulent misconduct resulting in injury to all class members.

116.  *Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).*  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting statewide, multistate and national consumer class actions. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Class they represent, and have the financial resources to do so.  Neither Plaintiff nor her counsel have any interest adverse to the Class.

117.  *Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).*  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.  Such individual actions would create a risk of adjudications which would be dispositive of the interests of other Class members and impair their interests. Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

118.  *Superiority: Federal Rule of Civil Procedure 23(b)(3).*  Plaintiff and Class members have suffered and will continue to suffer harm and damages as a result of Defendants' conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, the vast majority of the class members likely would find the cost of litigating their claims to be prohibitive, and would have no effective remedy at law. Because of the relatively small size of the individual class members claims, it is likely that only a few class members could afford to seek legal redress for defendant's conduct. Further, the cost of litigation

could well equal or exceed any recovery. Absent a class action, class members will continue to incur damages without remedy. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation, and that class treatment would conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### FIRST CAUSE OF ACTION

**Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1962(c)
(On Behalf of Plaintiff and the Nationwide Class)**

119.    Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

120.    Plaintiff brings this cause of action on behalf of the nationwide class against all Defendants.  At all relevant times, each of Defendants has been a "person" within the meaning of 18 U.S.C. § 1961(3), because each was capable of holding "a legal or beneficial interest in property."

121.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

122.    At all relevant times, Defendants, along with other individuals and entities, including unknown third parties, operated an association-in-fact enterprise, which was formed for the purpose of maximizing profits by unlawfully charging customers for undisclosed collateral insurance policies, and through which enterprise they conducted a pattern of racketeering activity

under 18 U.S.C. § 1961(4).   The enterprise is called the "Enterprise."   The activities of the Enterprise affected interstate commerce through a pattern of racketeering activity.

123.    At all relevant times, the Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendants' unlawful profit-making scheme.

124.    The association-in-fact Enterprise consisted of at least Wells Fargo Bank, N.A., and National General.   While members of the Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.   The Enterprise has a systematic linkage because there are agreements, coordination activities, contracts, and financial agreements between the Defendants.

125.    At all relevant times, the Enterprise:

    a.    had an existence separate and distinct from each RICO Defendant;

    b.    was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and

    c.    was an ongoing and continuing organization consisting of legal entities, including Defendants, and other entities and individuals associated for the common purpose of imposing unlawful and undisclosed collateral insurance on class members through false and misleading sales tactics, omissions, and fraud, and deriving profits and revenues from those activities.

126.    Each member of the Enterprise shared in the bounty generated by the enterprise.

127.    The Defendants through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and

the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to impose undisclosed collateral insurance on contracts.

128.    The Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries. Defendant Wells Fargo has Defendant National General verify whether a borrower maintains required insurance and then underwrites a policy on behalf of the borrower, providing lending documents that fail to properly disclose the insurance, providing statements that fail to properly disclose the insurance premiums, and arranging the order of charges to borrowers' accounts to cause borrowers to become delinquent.

129.    Defendants' systematic schemes to unlawfully charge premiums, interest, and other charges for unnecessary insurance policies on the accounts of borrowers who have auto loans from Defendants, as described above, was facilitated by the use of the United States Mail and wire. Defendants' schemes constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), as acts of mail and wire fraud, under 18 U.S.C. §§ 1341, 1343.

130.    Defendants used the mail and wire in furtherance of their scheme to defraud its auto loan customers by obtaining money from borrowers using false or fraudulent pretenses. The Enterprise provided insurance policies, lending documents, auto loan statements, payoff demands, or proofs of claims to borrowers through the mail or wires. Through those means, the Enterprise demanded that borrowers pay the undisclosed insurance premiums. Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

131.    The insurance policies were unlawful. Thus, Defendants' representations that the premiums and related charged were owed were fraudulent. In an effort to pursue their fraudulent

scheme, Defendants knowingly fraudulently represented that the premiums and charges were owed.

132.    Defendants made false statements using the Internet, telephone, facsimile, United States Mail, and other interstate commercial carriers.  These statements were material to Plaintiff and the other Class members.

133.    Each of these acts constituted an act of mail fraud for purposes of 18 U.S.C. § 1341.

134.    Using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about the premiums and fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

135.    The foregoing constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  All of the foregoing acts are part of the nexus of the Enterprise and involved similar participants, a similar purpose, and similar impact on the class.

136.    As a direct and proximate cause of these violations of 18 U.S.C. § 1962(c) and (d), Plaintiff and the other Class members have suffered substantial damages, and Defendants are liable to Plaintiff and the other Class members for treble damages, together with all costs of this action, plus reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

**Violations of the Racketeer Influenced and Corrupt Organizations Act,**
**Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiff and the Nationwide Class)**

137.    Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

138.    Plaintiff brings this cause of action on behalf of the nationwide class against all Defendants for conspiring to violate 18 U.S.C. § 1962(c).  Defendants were aware of the nature and scope of the Enterprise's unlawful scheme, and agreed to participate in it.

139.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  18 U.S.C. § 1962(d).

140.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff and the other Class members have been injured by the predicate acts which make up Defendants' patterns of racketeering activity in that unlawful insurance premiums were assessed on their auto loan accounts.

### THIRD CAUSE OF ACTION

**Violations of the South Dakota Deceptive Trade Practices and Consumer Protection Law,**
**81 S.D. Codified Laws §§ 37-24-1, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class, Against Wells Fargo Bank, N.A.)**

141.    Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

142.    Plaintiff brings this claim individually and on behalf of a nationwide class of consumers against Wells Fargo.  Nominally the conduct alleged in this count was carried out by Wells Fargo, headquartered in South Dakota.  However, regardless of which specific entity engaged in the alleged conduct, Wells Fargo is legally responsible for the conduct for the reasons set forth above.

143.    The South Dakota Deceptive Trade Practices and Consumer Protection Law is codified at S.D. Codified Laws §§ 37-24-1, *et seq.*

28

144.    Plaintiff and the other Class members are "persons" under the statute.

145.    Wells Fargo engaged in trade and commerce, as those terms are defined under the statute.  Wells Fargo charging Plaintiff and the other Class members for unnecessary and unrequested auto insurance policies, fraudulent statements regarding the charges, and omissions of material facts, as set forth herein, all constitute unlawful, fraudulent, and unfair practices.

146.    Wells Fargo concealed and suppressed material facts concerning the undisclosed auto insurance. Wells Fargo failed to properly disclose the policies and failed to disclose the policies were unnecessary and unlawful.

147.    Plaintiff and the other Class members relied on Wells Fargo's fraudulent representations that the CPI auto insurance charges were lawful and necessary and required to maintain their accounts in good standing and avoid repossession of their vehicles.

148.    Plaintiff and the other Class members were damaged by paying for unlawful premiums and other charges related to the CPI auto insurance policies.

149.    Wells Fargo's conduct is an incurable deceptive act because it was done as part of a scheme with intent to defraud and mislead.

150.    As a result of Wells Fargo's conduct, Plaintiff and the Class members suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**Violation of New York General Business Law, Deceptive Acts and Practices
N.Y. GBL § 349
(On Behalf of Plaintiff and the Nationwide Class, Against National General)**

151.    Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

152.    Plaintiff brings this claim individually and on behalf of a nationwide class of consumers against National General.  The conduct alleged in this Complaint as attributable to National General originating in the State of New York.

153.    Plaintiff and other members of the Class are "consumers" in accordance with N.Y. GBL § 349.

154.    At all relevant times hereto, National General conducted trade and commerce in New York and elsewhere within the meaning of GBL § 349.

155.    National General concealed the following material facts from Plaintiff and the class members:

    a.    Together with Wells Fargo, it underwrote policies for automobile loans, which upon information and belief began in 2006;

    b.    That the insurance policies were more expensive than auto insurance that customers often already had obtained on their own; and

    c.    That the insurance—which was concealed and undisclosed—was unneeded.

    d.    That the coverage under the insurance policies was not "full coverage."

    e.    That the cost of the insurance policies was excessive compared to what Defendants could have charged.

156.    National General failed to disclose material facts from Plaintiff and Class members with respect to the unlawful insurance practices in underwriting policies for automobile insurance for policies that class members neither wanted nor needed.

157.    National General intended that Plaintiff and Class members rely on its acts of concealment and omissions in order to drive up profits for the sale of insurance.

158.    The forgoing acts, omissions, and practices proximately caused Plaintiff and Class members to suffer actual injury.

## FIFTH CAUSE OF ACTION

**Violations of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18**
**(On behalf of the Wisconsin State Sub-Class)**

159.    Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

160.    Plaintiff brings this cause of action on behalf of herself and the Wisconsin State Sub-Class against Defendants.

161.    The Wisconsin Deceptive Trade Practices Act prohibits untrue, deceptive, or misleading representations in the sale of goods and services to the public.

162.    Defendants' representations to the Wisconsin State subclass regarding the unnecessary, overpriced CPI auto insurance policies were untrue, deceptive and misleading.

163.    Plaintiff and class members relied on defendant's untrue, deceptive, and misleading representations that the CPI auto insurance charges were lawful and necessary and required to maintain their accounts in good standing and avoid repossession of their vehicles.

164.    Plaintiff and class members were damaged by paying for unlawful premiums and other charges related to the CPI auto insurance policies.

## SIXTH CAUSE OF ACTION

**Violation of Wis. Stat. §100.195, Unfair Billing for Consumer Goods or Services**
**(On Behalf of Plaintiff and the Wisconsin State Sub-Class, Against all Defendants)**

165.     Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

166.     Plaintiff and other class members are consumers under Wis. Stat. §100.195(1)(b).

167.     At all relevant times hereto, Defendants were in the business of selling consumer goods and/or services as defined in Wis. Stat. §100.195.

168.     Defendants' monthly billing statements to Plaintiff and Class members are each a "bill" as defined in Wis. Stat. §100.195.

169.     Defendants' representations that Plaintiff and Class members' payment obligations had been or may be referred to a collection agency or credit reporting agency are each a "bill" as defined by Wis. Stat. §100.195.

170.     Defendants billed Plaintiff and Class members for consumer goods and/or services that Plaintiff and Class members had not agreed to purchase in violation of Wis. Stat. §100.195(2)(a).

171.     Defendants billed Plaintiff and Class members for consumer goods and/or services at a price that is higher than a previously agreed upon between Plaintiff and Defendants in violation of Wis. Stat. §100.195(2)(b).

172.     Plaintiff and Class members have suffered losses because of Defendants' violations of Wis. Stat. §100.195(2)(a) & (b).

## SEVENTH CAUSE OF ACTION

**Unjust Enrichment and Restitution**
**(On Behalf of Plaintiff and the Nationwide Class)**

173.    Plaintiff re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

174.    Plaintiff brings this claim individually and on behalf of a nationwide class of consumers. This equitable claim is pleaded in the alternative to Plaintiff's and the other Class members' legal claims.

175.    Plaintiff and the other Class members conferred a benefit on Defendants via the unlawful insurance premium charges, causing profits to inure to Defendants.  Defendants, however, failed to disclose their knowledge that Plaintiff and the other Class members paid unlawfully-charged insurance premiums.

176.    It would be inequitable, unconscionable, and unjust to permit Defendants to retain the benefit of these profits that they unfairly obtained from Plaintiff and the other Class members.

177.    Plaintiff and the other Class members, having been injured by Defendants, are entitled to restitution or disgorgement of profits as a result of Defendants' unjust enrichment, to the detriment of Plaintiff and the other Class members.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that this Court enter judgment in their favor and against Defendants on each Cause of Action of the Complaint and requests that the Court:

a.    Issue an Order certifying the Class and/or any subclasses the Court deems appropriate, appointing Plaintiff as class representative and her undersigned counsel as Class Counsel, and directing that reasonable notice of this action be given by Defendants to all Class members;

33

b.    Award to Plaintiff and the other Class members all damages—including treble damages—and equitable relief (including disgorgement) that the Court deems appropriate;

c.    Award to Plaintiff and the other Class members all exemplary and/or punitive damages allowed by law that the Court deems appropriate;

d.    Issue an injunction against the continued unlawful practices as set forth herein;

e.    Award interest on any moneys wrongfully obtained from the date of collection through the date of entry of judgment in this action;

f.    Grant Plaintiff and the other Class members their reasonable attorneys' fees and costs under any applicable fee shifting statutes; and

g.    Grant Plaintiff and the other Class members such further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.


Dated:  August 29, 2017                    Respectfully submitted,

By: /s/ Jeffrey L. Koenig, Esq.
Jeffrey K. Koenig, Esq. (NY Bar. No. JK1471)
Hecht, Kleeger & Damschek, PC
19 West 44th Street
Suite 1500
New York, New York 10036
Tel: 212-490-5700
Fax: 212-490-4800
koenig@lawyer1.com
www.lawyer1.com

Arnold Levin*
Charles E. Schaffer*
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
ALevin@lfsblaw.com
CSchaffer@lfsblaw.com
www.LFSBLaw.com

Franklin D. Azar, Esq.*
Keith Scranton, Esq.*
Hugh Z. Balkin, Esq.*
Franklin D. Azar & Associates, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Tel: (303) 757-3300
Fax: (303) 757-3206
azarf@fdazar.com
scrantonk@fdazar.com
balkinz@fdazar.com

**Counsel for Plaintiff and the Proposed Class**

* Will apply for *pro hac vice* admission